**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | | |
|---|---|---|
| RANDAL SWAFFORD | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:05-CV-00376-PRC |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social Security | ) | |
| Administration,[1] | ) | |
| Defendant. | ) | |

**OPINION and ORDER**

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Randal Swafford

on October 11, 2005, and on Plaintiff's Motion for Summary Judgment [DE 17], filed on November

9, 2006.  Pursuant to 42 U.S.C. § 405(g), the Plaintiff seeks judicial review of the final decision of

the Commissioner, denying him Disability Insurance Benefits ("DIB") under the Social Security

Act. For the following reasons, the Court remands the case for further proceedings before the ALJ.

**PROCEDURAL BACKGROUND**

On November 19, 2002, the Plaintiff applied for DIB, alleging disability since July 26, 2001.

Plaintiff's claim for benefits was denied initially on February 13, 2003, and again upon

reconsideration on June 11, 2003.  Upon Plaintiff's request, Administrative Law Judge John Pope

(hereinafter, "ALJ") held a hearing on August 16, 2004 in Merrillville, Indiana.  The Plaintiff

appeared in person, represented by counsel, and testified.  Leonard Fisher, a Vocational Expert

(hereinafter, "VE"), also testified at the hearing.  On May 2, 2005, the ALJ issued a decision finding

---

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of the Social Security Administration. Pursuant to Federal Rule of Civil Procedure 25(d)(1) and the last sentence of 42 U.S.C. § 405(g), Michael J. Astrue is automatically substituted as the Defendant in this civil action.

that the Plaintiff was not disabled as defined by the Social Security Act.

Specifically, the ALJ made the following findings:

1.  The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through December 31, 2002.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant's injury to the right shoulder and wrist, and personality disorder are considered "severe" based on the requirements in the Regulations 20 C.F.R. § 404.1520(c).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, sit for about six hours in an eight-hour workday, stand and/or walk for about six hours in a workday, occasionally climb ramps and stairs, and never climb ropes, ladders or scaffolds.  He can do no pushing or pulling with the right upper extremity, only occasional overhead reaching with the right arm, and frequent fingering with his right hand.  He must avoid concentrated exposure to hazards, and have only occasional contact with the public, co-workers and supervisors.

7.  The claimant's past relevant work as a machinist did not require the performance of work-related activities precluded by his residual functional capacity (20 C.F.R. § 404.1565).  (About 10 percent of 12,000 machinist jobs in the area are performed at the light level of exertion).

8.  The claimant's medically determinable injuries to the right shoulder and wrist, and personality disorder do not prevent the claimant from performing his past relevant work.

9.  Even if the claimant could not perform his past relevant work, there are a significant number of jobs in the national economy at the light exertional level, which the claimant could perform.

10. The claimant was not under a "disability" as defined in the Social Security

2

Act, at any time through the date of the decision (20 C.F.R. § 404.1520(f)).

*See* R. 17-24.

On June 28, 2005, the Plaintiff submitted a Request for Review of Hearing Decision and a memorandum in support of his request. On August 18, 2005, the Appeals Council denied Plaintiff's request for review. As a result, the ALJ's May 2, 2005 decision became the final decision of the Commissioner.

On October 11, 2005, the Plaintiff filed his Complaint in this Court, seeking review of the final decision pursuant to 42 U.S.C. § 405(g) and alleging that the ALJ's decision was not supported by substantial evidence and premised on errors of law. On May 3, 2006, pursuant to sentence six of 42 U.S.C. § 405(g), the Commissioner filed Defendant's Motion for Remand because the Commissioner was unable to locate Plaintiff's hearing file. On May 5, 2006, the Court granted the remand. On August 2, 2006, the Commissioner filed Defendant's Motion to Reinstate, which the Court granted on August 28, 2006. On September 25, 2006, the Commissioner filed an Answer. On November 9, 2006, the Plaintiff filed Plaintiff's Motion for Summary Judgment and Plaintiff's Memorandum in Support of His Motion for Summary Judgment. On November 28, 2006, the Commissioner filed a Memorandum in Support of the Commissioner's Decision, and, on January 4, 2007, the Plaintiff filed Plaintiff's Reply to the Commissioner's Memorandum in Support of Her Decision.

On May 31, 2006, the parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

**FACTS**

The Plaintiff was born on July 6, 1960. Plaintiff was forty-one (41) years old at the time of the alleged onset of his disability and forty-four (44) years old at the time of the hearing. At the time he filed his disability report on November 2, 2002, the Plaintiff was 5'8" tall and weighed approximately 190 pounds. The Plaintiff has a high school diploma. The Plaintiff has past relevant work experience as an exterminator, a machinist, and a grinder. Because of his alleged impairments to his shoulder, wrist, back, and neck, the Plaintiff has not performed substantial gainful activity since July 26, 2001.

**A.     Medical Evidence**

In 1992 and 1999, the Plaintiff was involved in two accidents, a fall from a roof and a truck accident, respectively. As a result of these accidents, the Plaintiff has had a history of injuries to his right upper extremity, including numbness in his right hand, a right wrist fracture, a right elbow fracture, and a right clavicle fracture. He underwent surgeries to fix the wrist, elbow, and clavicle. The clavicle fracture required three surgeries to correct. Despite these injuries, the Plaintiff returned to work.

On June 5, 2001, the Plaintiff was involved in an accident whereby a customer at a McDonald's restaurant slammed the door into him. The Plaintiff reported injuries to his right shoulder and right wrist. On August 27, 2001, Anton Fakhouri, M.D., an orthopaedic surgeon, examined the Plaintiff and diagnosed him with acromioclavicular ("A/C")[2] joint separation, scapholunate[3] disassociation of the right wrist, and right median nerve compressive neuropathy. Dr.

---

[2] Acromioclavicular relates to the acromion and clavicle, and denotes the articulation and ligaments between the clavicle and the acromion of the scapula. Stedman's Medical Dictionary 19 (28th ed. 2006).

[3] Scapholunate refers to the scaphoid bones of the hand. Stedman's Medical Dictionary 1725 (28th ed. 2006).

Fakhouri ordered an MRI of Plaintiff's right wrist, but found only degenerative changes with unremarkable results.  After the Plaintiff denied conservative treatment options, on October 10, 2001, Dr. Fakhouri performed a right wrist arthroscopy[4] and scapholunate ligament reconstruction. No complications resulted from the surgery.  On December 3, 2001, Dr. Fakhouri removed the pins from Plaintiff's wrist, and referred Plaintiff to therapy, which he attended from December 2001 through June 2002.

On February 15, 2002, due to complaints of pain in his right shoulder and right wrist, Dr. Fakhouri administered a cortisone injection to the Plaintiff.  Approximately one month later on March 15, 2002, in light of Plaintiff's continued complaints of pain, especially during overhead activities, Dr. Fakhouri ordered an MRI of the right shoulder.  Dr. Fakhouri diagnosed the Plaintiff with impingement syndrome of the right shoulder and degenerative joint disease of the A/C joint. Dr. Fakhouri discussed operative and non-operative approaches, and the Plaintiff opted for surgery. On April 24, 2002, Dr. Fakhouri performed surgery on Plaintiff's right shoulder.  Throughout May and June 2002, Dr. Fakhouri documented Plaintiff's improved functioning.

On July 26, 2002, the Plaintiff continued to complain of neck and shoulder pain.  Dr. Fakhouri noted no further evidence of impingement syndrome or rotator cuff problems.  Dr. Fakhouri informed the Plaintiff that he could consider returning to work, but the Plaintiff felt he was in too much pain.  Dr. Fakhouri recommended a functional capacity evaluation to determine Plaintiff's ability to perform work activities and ordered an MRI of Plaintiff's cervical spine, which revealed essentially normal findings.  Concluding that he had nothing further to offer him regarding his neck, Dr. Fakhouri referred the Plaintiff to Richard Lim, M.D., a spine surgeon.  Dr. Lim

---

[4]Arthroscopy is an endoscopic examination of the interior of a joint.  Stedman's Medical Dictionary 162 (28th ed. 2006).

concluded that Plaintiff's symptoms were related to his shoulder, and were not due to any problems with his cervical spine. Dr. Lim referred the Plaintiff to Mark Bowen, M.D., who concluded that surgery was not necessary.

On January 17, 2003, M. Zeitoun, M.D., examined the Plaintiff at the request of the State Agency. Dr. Zeitoun documented a reduced range of motion of Plaintiff's lumbar spine, cervical spine, right shoulder, and right wrist; 5/5 muscle strength; no atrophy; and symmetrical reflexes. Dr. Zeitoun reported that the Plaintiff had "good grip strength" and fine finger manipulative abilities.

On February 6, 2003 and May 16, 2003, A. Dobson, M.D., and T. Crawford, M.D., reviewed Plaintiff's medical records at the request of the State Agency, respectively. Both physicians concluded that the Plaintiff could perform light work,[5] involving limited pushing and pulling; occasional overhead reaching with his right arm as well as occasional climbing, balancing, stooping, kneeling, crouching, and crawling; and no concentrated exposure to hazards.

In May 2003, James Kenny, a clinical psychologist, examined the Plaintiff at the request of the State Agency. The Plaintiff complained of depression as a result of his constant pain. The Plaintiff indicated that he had a history of a bipolar disorder, had previously been prescribed medication, and that he was also in therapy for two or three years. Dr. Kenny noted that the Plaintiff was oriented with no overt psychotic signs. The Plaintiff described his chronic mood as angry, and Dr. Kenny noted that Plaintiff presented with an angry mood and a negative outlook. Dr. Kenny diagnosed the Plaintiff with bipolar disorder, pain disorder, personality disorder, and assigned a

---

[5] The regulations define "light work" as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

Global Assessment of Functioning ("GAF") scale score of 50.[6]

In May 2003, at the request of the State Agency, W. Shipley, Ph.D., reviewed the record evidence and concluded that the Plaintiff did not have a listing-level mental impairment. Dr. Shipley further opined that Plaintiff retained the ability to perform simple tasks. In addition, although Dr. Shipley diagnosed the Plaintiff with bipolar disorder, Dr. Shipley did so based on the fact that the Plaintiff was prescribed lithium several years ago. Dr. Shipley also diagnosed the Plaintiff with pain and personality disorder. Dr. Shipley opined that Plaintiff's limitations primarily resulted from his physical restrictions.

On July 9, 2003, Gary Misamore, M.D., examined the Plaintiff, who complained of chronic right shoulder pain, stiffness, weakness, and crepitus. While Dr. Misamore's examination produced inconclusive results, he noted that Plaintiff's complaints of pain were nonspecific and that his performance during the physical examination suggested the likelihood of "symptom magnification."

In September 2003, Dale Snead, M.D., examined the Plaintiff, who complained of pain with any motion of his right wrist and continuing problems with his right shoulder. Dr. Snead documented Plaintiff's reduced range of motion, but noted good strength and no atrophy. Dr. Snead ordered x-rays of Plaintiff's right wrist, which revealed a normal scapholunate interval, mild ulnar positivity, and some degenerative changes of the distal radial carpal joint. Dr. Snead placed Plaintiff's arm in a short cast to determine if wrist immobilization would eliminate his pain. At a follow-up visit on October 7, 2003, the Plaintiff reported that he was overall "quite happy" with his

---

[6] The GAF scale reports a clinician's assessment of the an individual's overall level of functioning. American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 30-31 (4th ed. 1994) ("DSM-IV"). An individual's GAF is rated between 0 and 100, with lower numbers indicating more severe mental impairments. A GAF score of 50 is characterized as serious symptoms (e.g., suicidal ideation, sever obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job). *Id.*

wrist in the cast. Dr. Snead indicated that he was reluctant to operate on the Plaintiff, especially given his smoking habit. Dr. Snead referred the Plaintiff to a physical therapy program, and advised him to return after he had stopped smoking for at least two months.

**B.     Plaintiff's Testimony**

At the August 16, 2004 hearing, the Plaintiff testified that he is married, right-handed, and lives with his wife and two children in a single level home in Rensselaer, Indiana. The Plaintiff testified that he was currently on welfare and that he was terminated from his last position as an exterminator after his accident at McDonald's on June 5, 2001. The Plaintiff testified as to the following work history: before 1992, he worked as an exterminator; between 1992 and 1997, he did not work due to seven surgeries he underwent for prior injuries; between 1997 and 1999, he worked at a factory in a variety of positions, including as a machinist, an apprentice, and a grinder; and from 1999 until July 26, 2001, the day that he allegedly became unable to work, he again worked as an exterminator.

The Plaintiff further testified that he was no longer able to exterminate because he could not freely use his hands and feet to get into tight spaces and carry heavy equipment, due to the pain. The Plaintiff stated that upon the termination of his exterminating job, he did not look for another job, or request assistance from the State Employment Service or from vocational rehabilitation. The Plaintiff explained that on July 5, 2001, while exiting a McDonald's bathroom, a man slammed the door against him, which knocked him to the ground. The Plaintiff testified that as a result of the accident, both his right shoulder and right wrist were fractured. The Plaintiff stated that he experienced headaches and neck pain as well as right hip pain. The Plaintiff explained that due to his injuries, he was unable to pick anything up, reach, crawl, climb, or push and pull. The Plaintiff

further explained that any kind of general activity intensified the pain.

The Plaintiff testified that he was currently seeing Dr. Stewart from the Pain Management Center, and that he was being treated with medicine.  He stated that Dr. Lim, whom he saw not long after the accident, suggested that Plaintiff apply for Social Security disability benefits.  Furthermore, the Plaintiff testified that Dr. Snead had told him not to work, although Dr. Snead did not mention any specific physical restrictions such as standing, walking, or lifting.  The Plaintiff further testified that an operation to fuse his right wrist bone had yet to be performed.

The Plaintiff testified that the medicine he was currently taking helped him, but that the side effects made him tired and unable to concentrate.  He also noted that the medications made him moody.  The Plaintiff testified that, besides the medication, laying down helped him with the pain.  The Plaintiff explained that on a typical day, he would wake up at 10:00 am and watch television.  He stated that he was able to dress himself, although snapping the buttons caused him pain.  He also stated that he was able to bathe, fix something to eat, manage his own money, and go to the grocery store.  The Plaintiff further explained that he could do the laundry and vacuum, but that he chose not to because of the pain.  He testified that he did not enjoy any activities, did not have any hobbies, did not exercise, and that he only left his house to go to the doctor's office or to the lawyer's office.  He further stated that he only spent an hour or two outside of his bedroom, or approximately eighty-five percent (85%) of his day in his bedroom.

The Plaintiff testified that his psychological problems consisted of moodiness, anger, and stress.  He stated that he experienced these problems every day, and that he was treated with medicine.  He further stated that he did not have friends, did not belong to any social clubs, and rarely saw his family who did not live with him.  He explained that he had problems getting along

with people other than his family members.  The Plaintiff further stated that he had problems concentrating. The Plaintiff stated that although he did not have thoughts about hurting himself, he did not feel good about his situation and that he was frustrated.

The Plaintiff testified that he experienced pain in the right wrist, right hip, and neck.  He also stated that he often had headaches in the back of his head, which usually lasted approximately half a day.  He further stated that he was in relentless pain everyday.  Without medication, the Plaintiff felt the pain was a ten; with medication, he felt the pain was a seven or an eight (on a pain scale of one to ten, with ten being the most pain).  The Plaintiff explained that his pain was due to his clavicle, which he believed was still broken, and his shoulder, which had a three-centimeter long separation between the bones.  The Plaintiff stated he sometimes woke up in the morning in tears if his pain level was high.  Regarding his left side, the Plaintiff stated that although the surgeon had told him not to lift heavy objects, he could lift a gallon of milk and carry a bag of groceries.  The Plaintiff also stated that he could likely stand for twenty minutes and walk two to three blocks, although his hips would likely start hurting and would need about five to ten minutes to recover. He stated that he had no problems sitting, driving, and using his left arm and his feet.  The Plaintiff stated that he had gone to seventy-two therapy sessions, but could no longer carry on with those sessions.

## C.      Testimony of the VE

The VE testified at the hearing and classified Plaintiff's past work experience.  The VE stated that Plaintiff's past work as an exterminator was medium with physical demand as performed by the Plaintiff, and semi-skilled in nature.  The VE further stated that Plaintiff's work as a machinist and a grinder were both medium in physical demand and skilled in nature.

The ALJ asked the VE to consider a claimant with Plaintiff's age, education, and work experience, along with the following restrictions:  lift twenty pounds occasionally and ten pounds frequently; stand and walk with normal breaks for about six hours in an eight-hour day; sit with normal breaks for about six hours in an eight-hour day; occasionally climb ramps and stairs but never on ropes, ladders, or scaffolds; frequent fingering of the right hand; avoid concentrated exposure to hazards; and limited to jobs which require only occasional contact with the public, co-workers, and supervisors.  Based on the hypothetical question, the VE responded that the individual could return to work as a machinist, but not as an exterminator.  The VE further stated that the claimant's limitations would not rule out work as an inspector (2,300 jobs) and ten percent of all machinist jobs in the region (1,240 out of 12,000 jobs), which are light with physical demand and semi-skilled in nature.  The VE also stated that the individual could work as an information clerk (300-500 jobs), parking lot attendant (2,400 jobs), office helper (2,500 jobs), and shipping and receiving worker (400-600 jobs).

The ALJ then asked him whether the same hypothetical individual with Plaintiff's impairments, assuming the Plaintiff is being truthful, could engage in any type of job.  The VE responded that there were no jobs in the competitive labor market that the individual could perform because of the headaches, pain, temper, and the individual's need to lay down during the day.

Plaintiff's attorney asked the VE if a claimant would be able to work in the positions he listed if the claimant, due to pain, had difficulty concentrating.  The VE responded that such a claimant could not work.  Plaintiff's attorney then asked the VE if a claimant would be precluded from performing the jobs he had listed if the claimant lacked bimanual dexterity. The VE responded that it was possible because a claimant could use the right hand on occasion and not on a constant

basis.

**D.     The ALJ's decision**

Applying the five-step sequential evaluation, the ALJ concluded that the Plaintiff was not disabled within the meaning of the Act.  At step one, the ALJ determined that the Plaintiff had not engaged in substantial gainful activity since July 26, 2001.  At step two, the ALJ determined that Plaintiff's injuries to his right shoulder and wrist, and personality disorder were "severe" impairments within the meaning of the Regulations.  At step three, the ALJ found no impairments which, either individually or in combination, met the criteria of the listed impairments described in 20 C.F.R., Subpart A, Appendix 1.

At step four, the ALJ found Plaintiff's testimony and subjective allegations were "less than fully credible."  (R. 21).  In evaluating Plaintiff's credibility, the ALJ considered evidence from the his treating physicians, Dr. Fakhouri and Dr. Misamore.  Next, adopting the findings of the State Agency medical consultants, the ALJ found that the Plaintiff retained the following Residual Functional Capacity ("RFC"):  lift and carry twenty pounds occasionally and ten pounds frequently; sit for about six hours in an eight-hour work day; stand and walk with normal breaks for about six hours in an eight-hour work day; sit with normal breaks for about six hours in an eight-hour work day; occasionally climb ramps and stairs but never on ropes, ladders, or scaffolds; frequent fingering of the right hand; avoid concentrated exposure to hazards; and limited to jobs which require only occasional contact with the public, co-workers, and supervisors.  Based on Plaintiff's RFC and the VE's testimony, the ALJ determined that the Plaintiff could perform his past relevant work as a machinist.  The ALJ further reasoned that, even assuming that he could not perform his past relevant work, the Plaintiff could perform a significant number of jobs within the region, including  work as

an information clerk (300-500 positions), parking lot attendant (2,400 positions), office helper (2,500 positions), and shipping and receiving weigher (400-600 positions).

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will only reverse if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford*, 227 F.3d at 869; *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the

13

reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) . The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 995 (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he or she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(e), (f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. § 404.1520(a)(4). The steps are:

(1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to Step 2.

(2) Does the claimant have an impairment or combination of impairments that are severe? If no, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to Step 3.

(3) Does the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if no, then the inquiry proceeds to Step 4.

(4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to Step 5.

(5) Can the claimant perform other work given the claimant's residual functional capacity, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(i)-(iv); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).   At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's RFC.  "The RFC is an assessment of what work-related activities the claimant can perform despite [his] limitations." *Young*, 362 F.3d at 1000.  The ALJ must assess the RFC based on all the relevant evidence of record. *Id*. at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Id*. at 1000; *see also Zurawski*, 245 F.3d at 886; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff argues that the ALJ committed error by: (1) failing to explain his analysis of the

weight given to Plaintiff's treating and consulting physicians and, as a result, mischaracterizing Plaintiff's diagnosed conditions; (2) failing to properly analyze Plaintiff's credibility; (3) failing to pose a proper hypothetical question to the VE by omitting Plaintiff's limitations on overhead activities and concentration, persistence, and pace; and (4) finding at step four that the Plaintiff could perform his past work as a machinist. The Court will address each of Plaintiff's arguments in turn.

### A.      Weight of treating physicians' opinions

Plaintiff argues that the ALJ should have accorded due weight to the opinions of his treating physicians and that the ALJ erred when he failed to give reasons for not according controlling weight to them. Specifically, Plaintiff argues that the ALJ erred by not adequately explaining why he did not accord controlling weight to the opinions of Drs. Fakhouri, Snead, Canady, and Schwartz, as treating physicians.

As a threshold point, the Court accepts Drs. Fakhouri and Snead as Plaintiff's treating physicians, but declines to accept Drs. Canady and Schwartz as Plaintiff's treating physicians.

In assessing disability, more weight is given to the opinion of a treating physician because of the greater familiarity with a claimant's conditions and circumstances. *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). In order to meet the qualifications of a "treating physician" under the regulations, a doctor "must provide a detailed, longitudinal picture of Plaintiff's impairments" or bring a "unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from the reports of individual examination." 20 C.F.R. § 404.1527(d)(2), 416.927(d)(2). The record reveals that both Drs. Fakhouri and Snead had extensive contact with the Plaintiff and offers the Court a longitudinal picture of the Plaintiff. The ALJ, in his decision, also

16

noted many of Dr. Fakhouri's and Dr. Snead's findings about the Plaintiff's medical condition.

However, Drs. Canady and Schwartz add little, if anything, to the overall picture of the Plaintiff's impairments.  According to the record, Dr. Canady examined the Plaintiff on only one occasion, August 21, 2001, regarding the Plaintiff's wrist and shoulder pain.  R. at 213.  Dr. Canady referred the Plaintiff to Dr. Fakhouri and, thereafter, Dr. Fakhouri treated the Plaintiff.  Because Dr. Canady only examined the Plaintiff once regarding his persisting wrist and shoulder problems, he does not provide a "longitudinal picture of the Plaintiff's impairments" and thus the Court does not consider Dr. Canady a treating physician, as defined by the regulations.

Next, regarding Dr. Schwartz, while it appears from the record that Dr. Schwartz treated the Plaintiff from June 13, 2001 to April 10, 2004, *see* R. at 200-212, and the Disability Determination Bureau sent a request for an assessment of the Plaintiff's physical ability, the record lacks Dr. Schwartz's assessment of the Plaintiff.  R. at 200.   Moreover, Dr. Schwartz's medical notes in the record are illegible and the Court cannot decipher Dr. Schwartz's notes on the Plaintiff's condition. R. at 209-211.  Further, Plaintiff's opening brief mentions Dr. Schwartz only once.  Pl. Mem. at 4. This Court finds that while Dr. Schwartz appears to have been the Plaintiff's treating physician for approximately three years, an illegible medical record, a lack of the Plaintiff's assessment, and a single reference to Dr. Schwartz in the Plaintiff's brief hardly constitutes a "detailed, longitudinal picture of Plaintiff's impairments" or "a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from the reports of individual examination." Also, the ALJ does not note any of Dr. Schwartz's diagnoses in his decision.  As such, this Court declines to consider Dr. Schwartz as a treating physician, as defined by the regulations.

Turning to the substance of Plaintiff's argument as to the due weight accorded to his treating

physicians, i.e., Drs. Fakhouri and Snead, the ALJ must give a treating physician's opinion controlling weight if it is well supported by medical findings and is not inconsistent with the substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2); Social Security Ruling ("SSR") 96-2p; *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005). However, the ALJ is entitled to discount the medical opinion of a treating physician if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); *Clifford*, 227 F.3d at 871) (quoting *Clifford*, 227 F.3d at 870) (internal quotation marks omitted). The ALJ must discuss, at some level, how the evidence of record contradicts the treating physician's diagnosis. *See Gudgel*, 345 F.3d at 470. When the ALJ does not give the treating physician's opinion controlling weight, the ALJ applies the following factors in evaluating the opinion: (1) length of treatment; (2) the nature and extent of the treating relationship; (3) to what extent the treating physician based his or her opinion on evidence such as medical signs and laboratory findings; (4) how consistent the treating physician's opinion is with the record; and (4) whether the treating physician is a specialist and any other relevant factors. *See* 20 C.F.R. § 404.1527(d)(2).

In his decision, the ALJ extensively documented Plaintiff's medical history. First, the ALJ recounted Plaintiff's medical record as documented by Dr. Fakhouri, including Dr. Fakhouri's diagnosis and treatments. Next, the ALJ noted Dr. Lim's and Dr. Bowen's diagnoses, finding that the Plaintiff had no cervical spine problems and required no shoulder surgery. The ALJ discussed Plaintiff's consultations with Drs. Misamore and Snead and their diagnoses and findings. The ALJ

18

then documented Dr. Zeitoun's consultative examination, and finally the ALJ documented Dr. Kenny's psychological examination of the Plaintiff.  After summarizing the Plaintiff's testimony and making a credibility assessment, the ALJ concluded by adopting the opinions of the State Agency medical consultants, specifically Drs. Dobson and Crawford.  However, in doing so, the ALJ failed to provide an explanation for why he adopted the consulting physicians' opinions, which the Court finds constitutes error.

As opposed to pointing to the portion of the ALJ's decision in which he articulates his reasons for rejecting the treating physicians' opinions and crediting the consulting physicians' opinions, this Court is left to speculate as to why the ALJ adopted the consulting physician's opinion. The ALJ's decision is devoid of any explanation as he moves from a summary of Plaintiff's medical history to his adoption of the consulting physicians' RFC finding, stating only that the consulting physicians' opinions are consistent with the objective medical evidence of record.  As noted above, the ALJ is entitled to discount the medical opinion of a treating physician if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability." *Skarbek*, 390 F.3d at 503 (citing *Dixon*, 270 F.3d at 1178; *Clifford*, 227 F.3d at 871) (quoting *Clifford*, 227 F.3d at 870) (internal quotation marks omitted).  The ALJ's decision lacks any findings of inconsistency between the treating and the consulting physicians or among treating physicians, which would allow him to adopt the opinions of the consulting physicians.  Furthermore, the ALJ failed to state his reasoning for crediting or rejecting the evidence, which constitutes error.

Moreover, even assuming *arguendo* that the ALJ found some inconsistencies in the medical

opinions between the consulting and the treating physicians or among the treating physicians, the ALJ's opinion does not perform the necessary analysis, which requires consideration of the following: the length of treatment, the nature and extent of the treating relationship, to what extent the treating physician based his or her opinion on evidence such as medical signs and laboratory findings, how consistent the treating physician's opinion is with the record, and whether the treating physician is a specialist and any other relevant factors. *See* 20 C.F.R. § 404.1527(d)(2). This constitutes error.

Along the same lines, Plaintiff next argues that although the ALJ adopted the opinions of the State Agency physicians, he failed to do so in their entirety. Specifically, the Plaintiff contends that while Drs. Crawford and Dobson found occasional limitations in all postural activities, such as balancing, kneeling, stooping, crouching, and crawling, the ALJ did not include these limitations in his final RFC finding.

"Residual functional capacity", or RFC, is a measure of what an individual can do despite the limitations imposed by his or her impairments. 20 C.F.R. § 404.1545(a). The determination of a claimant's RFC is a legal decision rather than a medical one. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). The RFC is an issue at steps four and five of the sequential evaluation process. Social Security Ruling 86-8p. "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id*. To ensure a valid RFC determination, the ALJ must follow SSR 96-8p, which states that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work related abilities on a function-by-function basis" and "include a narrative discussion describing how the evidence supports each conclusion... ." SSR 96-

8p.

The ALJ's RFC finding states that while the Plaintiff is capable of performing light work, the Plaintiff possesses limitations in his ability to climb ropes, ladders, or scaffolds, and push or pull. The limitations enumerated in the ALJ's RFC finding likely originated from the Plaintiff's testimony in which he stated that he could not push, pull, climb, or crawl, but did not mention any limitations in balancing, kneeling, stooping, or crouching.[7]  However, because the ALJ does not provide an explanation for why he omitted these limitations, this Court cannot discern the reasons for adopting the consulting physicians opinions yet omitting several limitations, which these same physicians found the Plaintiff to possess.

In opposition to Plaintiff's argument, the Commissioner relies on *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999).  In *Johnson*, the ALJ, in adopting the State Agency physicians' opinions, failed to point out that the consulting physician had checked the box for "limited" beside the caption, "Reaching all directions."  *Id*.  The Seventh Circuit found that the ALJ did not commit reversible error.  *Id*.  The Court reasoned that because elsewhere in the report the physicians had indicated an absence of any relevant exertional limitations, the ALJ's omission did not make a difference in establishing whether the Plaintiff could perform his past work as a carpenter.  *Id*.   Unlike the situation in *Johnson* however, here, the omission of these specific limitations, which both Drs. Dobson and Crawford found, *could* have made a significant difference in the ALJ's step four analysis.  For example, based on the ALJ's hypothetical question, which omitted Plaintiff's limitations in stooping, kneeling, or crouching, the VE found that approximately 1,200 machinist

---

[7] Although the Plaintiff states in his testimony that he is unable to crawl, the ALJ's RFC finding does not state any limitations in the Plaintiff's ability to crawl.

21

jobs exist that accommodate the Plaintiff's disabilities.[8]   However, a search in the *Dictionary of Occupational Titles* (4th rev. ed. 1991) ("DOT"), reveals that a machinist (DOT § 600.280-026)[9] job requires occasional stooping (exists up to one-third of the time), occasional kneeling (exists up to one-third of the time), and occasional crouching (exists up to one-third of the time).   While the VE may have been able to shed light on how many machinist jobs exist that also accommodate limitations in stooping, kneeling, and crouching, because the ALJ did not include these limitations in the hypothetical posed to the VE, this Court cannot be sure that machinist jobs, which accommodate all the limitations enumerated in the consulting physicians' opinion, exist in the national economy.[10]

In conclusion, the Court finds that the ALJ failed to articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning.   *See Young*, 362 F.3d at 995 (quoting *Scott*, 297 F.3d at 595) (providing that an ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review").   Specifically, after a long and thorough discussion of the Plaintiff's medical history, the ALJ failed to explain why he adopted the opinions of Plaintiff's consulting physicians and discounted the opinions of Plaintiff's treating physicians yet omitted certain physical limitations from the consulting physicians' opinions,

---

[8]*See infra* Part C (discussing the ALJ's failure to pose an appropriate hypothetical to the VE).

[9]While a search in the Dictionary of Occupational Titles reveals multiple entries for "machinist", the Court uses the DOT number given by the VE during his testimony.  R. at 287.

[10]The Court is cognizant of the fact that regardless of the ALJ's omission of these certain limitations at step four, the ALJ's step five analysis may not be affected, i.e., the ALJ would reach the same conclusion that Plaintiff can perform other jobs in the national economy and thus is not disabled.  However, because the RFC affects the ALJ's analysis at step four and five, the ALJ's errors at step four with regard to the RFC makes such a determination by this Court impractical, and thus the Court declines to speculate.

which could have affected the step four analysis.[11]  In doing so, the ALJ committed error worthy of remand by failing to "minimally articulate his reasons for crediting or rejecting evidence of disability."  *Skarbek*, 390 F.3d at 503 (citing *Dixon*, 270 F.3d at 1178; *Clifford*, 227 F.3d at 871) (quoting *Clifford*, 227 F.3d at 870) (internal quotation marks omitted).[12]

**B.      Plaintiff's credibility assessment**

Plaintiff initially argues that a credibility assessment was unnecessary and that the ALJ should have accepted Plaintiff's complaints of pain in combination with the medical findings.  In the alternative, Plaintiff contends that the ALJ erred by failing to properly analyze Plaintiff's credibility pursuant to Social Security Ruling 96-7P, specifically by ignoring the Plaintiff's complaints of pain, medications and their side effects, and somatoform disorder.

In his decision, the ALJ found the Plaintiff's allegations regarding his limitations "to be less than fully credible."  R. at 21.  The Social Security regulations provide that, in making a disability determination, the Commissioner will consider a claimant's statement about his or her symptoms, including pain, and how they affect the claimant's daily life and ability to work.  *See* 20 C.F.R. § 404.1529(a).  However, subjective allegations of disabling symptoms alone cannot support a finding of disability.  *See id*.  The Regulations establish a two-part test for determining whether complaints

---

[11]The Plaintiff further argues that although Dr.Shipley found that the Plaintiff had difficulties maintaining concentration, persistence, or pace, the ALJ failed to include this limitation in his RFC assessment.  This Court finds that while the ALJ failed to explain why he did not adopt Dr. Shipley's assessment in its entirety, this does not constitute fatal error because Dr. Shipley found that the Plaintiff only had mild deficiencies in concentration persistence, and pace.  *See infra* Part 3 (discussing why the ALJ's failure to include the Plaintiff's mild limitation in concentration, persistence, and pace, do not constitute error).

[12]At the end of his argument as to the treating physicians, Plaintiff claims that the ALJ erred in characterizing his MRI as "essentially normal," when, in fact, according to the Plaintiff, the MRI revealed a deformity of the medial right clavicle and mild straightening of the normal lordotic curvature.  The Court finds that Plaintiff's argument is without merit because the record reveals that on August 29, 2002, after Dr. Fakhouri reviewed the MRIs, he noted that the MRI was "normal."  R. at 147.

of pain contribute to a finding of disability:  (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the symptoms alleged; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms.  20 C.F.R. § 404.1529(a).

The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)    The individual's daily activities;
(2)    Location, duration, frequency, and intensity of pain or other symptoms;
(3)    Precipitating and aggravating factors;
(4)    Type, dosage, effectiveness, and side effects of any medication;
(5)    Treatment, other than medication, for relief of pain or other symptoms;
(6)    Other measures taken to relieve pain or other symptoms;
(7)    Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).  In making a credibility determination, Social Security Ruling 96-7p states that the ALJ must consider the record as a whole, including objective medical evidence, the claimant's statement about symptoms, any statements or other information provided by treating or examining physicians and other persons about the conditions and how they affect the claimant, and any other relevant evidence.  *See* SSR 96-7p.

An ALJ is not required to give full credit to every statement of pain made by the claimant or to find a disability each time a claimant states he or she is unable to work.  *See Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996).  However, Ruling 96-7p provides that a claimant's statements regarding symptoms or the effect of symptoms on his ability to work "may not be disregarded solely because they are not substantiated by objective evidence."  SSR 96-7p at *6.  An ALJ's credibility determination is entitled to substantial deference by a reviewing court and will not be overturned

24

unless the claimant can show that the finding is "patently wrong." *Proschaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).

In the first instance, Plaintiff argues that a credibility assessment was unnecessary because substantial medical evidence supports his complaints of pain.  Specifically, the Plaintiff points out the following:  MRIs revealed a deformity of the right medial clavicle and muscle spasm; x-rays revealed degenerative change in the distal radial carpal joint; Dr. Fakhouri's diagnosis of impingement of the shoulder with no improvement from physical therapy; and Plaintiff's diagnosis with pain disorder and prescription of heavy narcotics for the pain.  In the alternative, Plaintiff argues that the ALJ failed to properly assess the Plaintiff's credibility, specifically by ignoring the Plaintiff's complaints of pain, medications and their side effects, and somatoform disorder.

The Court finds both of Plaintiff's arguments asserting error in the ALJ's credibility determination to be unconvincing.

As to Plaintiff's initial argument, the ALJ extensively documented the multiple diagnoses given to the Plaintiff by many of his physicians, both treating and consulting.[13]  The ALJ also documented many of the diagnoses that the Plaintiff raises in his brief, including the Plaintiff's pain.  Thus, based on a plain reading of his decision, the ALJ considered the Plaintiff's medical record thoroughly.  Furthermore, the ALJ's decision reveals that he did not find the Plaintiff credible because Plaintiff's allegations of disability were overstated in comparison to the Plaintiff's medical

---

[13]For example, the ALJ sets forth the Plaintiff's medical history and diagnoses from all of his treating and consulting physicians, including but not limited to, the following: the Plaintiff's accident in 1992, A/C joint separation, scapholunate dissociation of the right wrist, right median nerve compressive neuropathy, results from the MRI of the right wrist, continuing shoulder pain, tenderness over the acromiovacular joint, pain with adduction of the shoulder, treatment with cortisone injections, continued pain and weakness, sloping distal acromial process without fracture or acromioclavicular separation, superficial surface fraying, impingement syndrome, neck pain, tenderness over portions of the rotator cuff and shoulder muscles, give-away weakness with all strength testing, reduced range of motion, bipolar disorder, pain disorder, personality disorder, and chronic pain.

history.  Specifically, the ALJ noted that the Plaintiff's surgery in October 2001 went well and that the Plaintiff attended therapy and continued to progress.  The ALJ also noted that both Dr. Lim and Dr. Bowen found no evidence of cervical or shoulder pathology and that surgical intervention was not necessary.  Furthermore, the ALJ noted a lack of physical restriction on the Plaintiff from any source, treating or otherwise and discussed Dr. Fakhouri's contention that the Plaintiff likely could return to work.[14]  Finally, the ALJ emphasized Dr. Misamore's contention that the Plaintiff's pain was very non-specific and that there was a likelihood of symptom magnification.

As to Plaintiff's alternative argument, the record also indicates that in interviewing the Plaintiff, the ALJ considered all of the factors required by the regulations.  The ALJ asked the Plaintiff what he did in a typical day, and the specific activities, such as reading, getting dressed, grooming, and bathing, that the Plaintiff was capable of performing.  The ALJ extensively asked the Plaintiff about his pain, including pain in his wrist, hip, head, neck, and clavicle.  The ALJ asked the Plaintiff to describe the pain, asked the Plaintiff about his medications and the duration and type of the side effects, asked the Plaintiff if there were any circumstances that made the pain worse.  The ALJ further questioned the Plaintiff about methods, other than medications, that he performed to relieve the pain.  The ALJ also asked the Plaintiff about his emotional impairments and how that affected the Plaintiff.  Although the Plaintiff initially stated that moodiness was his only problem, the ALJ continued to probe the Plaintiff for more psychological problems.

In light of the objective medical evidence of record, the ALJ was not unreasonable in finding

---

[14] The Plaintiff correctly points out that one month after Dr. Fakhouri suggested that the Plaintiff return to work, the record indicates that "because of his symptoms, he is unable to return back to work."  R. at 150.   However, the record also indicates that Dr. Fakhouri did not write the note; rather, the record reveals that "RDL" wrote the note.  R. at 147.  Because this Court does not recognize (or opine on) who "RDL" is and because Dr. Fakhouri was not the one who later stated that the Plaintiff was in too much pain to return to work, this Court considers Dr. Fakhouri's original opinion that the Plaintiff likely could return to work as valid here.

Plaintiff "to be less than fully credible."  R. at 21.  The Court finds that the Plaintiff has not demonstrated that the ALJ's credibility determination was "patently wrong" and that the ALJ rationally articulated grounds for his decision.

**C.    Hypothetical questions posed to the VE**

The Plaintiff next argues that the ALJ erred by failing to include in his hypothetical question to the VE the Plaintiff's limitation in overhead activities, despite having found this limitation in his RFC determination.   Furthermore, the Plaintiff contends that the ALJ failed to include any limitations in concentration, persistence, or pace, despite having adopted the State Agency physician's mental RFC.[15]

*1.    Limitation of overhead activities*

When an ALJ relies on testimony from a VE to make a disability determination, the ALJ must incorporate all of the claimant's limitations supported by medical evidence in the record.  *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *see also Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003) ("Furthermore, to the extent the ALJ relies on testimony from a vocational expert, the question posed to the expert must incorporate all relevant limitations from which the claimant suffers") (citation omitted).   Otherwise, the VE will not refer Plaintiff to jobs that the Plaintiff cannot perform because the VE was unaware of all of the Plaintiff's limitations.  *Kasarsky*, 335 F.3d at 543.

The Court finds that the ALJ's failure to incorporate overhead activities constitutes error. The Plaintiff is correct in claiming that the ALJ, while finding in his RFC determination that Plaintiff has difficulties with overhead reaching, did not include this limitation in the hypothetical

---

[15]While the Commissioner responds to Plaintiff's argument regarding the State Agency physician's opinion, the Commissioner does not specifically address Plaintiff's argument regarding the limitation of overhead activities.

question that he posed to the VE.   Furthermore, the record reveals that on three occasions, on

August 27, 2001, February 15, 2002, and March 15, 2002, the Plaintiff complained of his difficulties

with overhead activities.  *See* R. at 155, 162.  While the ALJ may have had a good reason for not

including overhead reaching in his hypothetical, the ALJ provides no explanation indicating why

and such an omission constitutes error.[16]

2.      *Concentration, persistence, and pace*

        Next, the Court finds that the ALJ's failure to include a limitation in concentration,

persistence, and pace does not constitute error.  In support of his argument, the Plaintiff relies on

*Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003), in which the Seventh Circuit held that the

ALJ committed error when the ALJ failed to incorporate the plaintiff's difficulties in concentration,

persistence, and pace, despite having adopted this limitation in the decision.  However, in *Kasarsky*,

the Plaintiff suffered from *frequent* deficiencies in concentration, persistence, and pace.  *Id.*

Therefore, the Court in *Kasarsky* concluded that the ALJ committed error when he failed to

incorporate this limitation in the hypothetical.  *Id.*  In the instant case however, Dr. Shipley found

that the Plaintiff experiences only *mild* deficiencies of concentration, persistence, or pace, *see* R. at

227, a point recognized by the ALJ, *see* R. at 22 (noting that the Dr. Shipley opined that the Plaintiff

experienced " 'mild' deficiencies of concentration, persistence, or pace").  Moreover, Dr. Shipley

opined that the Plaintiff's limitations were primarily due to physical limitations.  In addition, the

Plaintiff testified that he drives and reads, activities which require some level of concentration.

---

[16]Moreover, the *Dictionary of Occupational Titles* (4th rev. ed. 1991) § 600-280-026, reveals that a machinist
performs "reaching" frequently (exists from one-third to two-thirds of the time).  While the dictionary does not reveal
the type of reaching required, overhead of otherwise, the inclusion of overhead reaching was critical to the ALJ's Step
Four analysis in ascertaining whether machinist jobs, which the Plaintiff is capable of performing, exist in the national
economy.

28

Therefore, while he may suffer mild difficulties in concentration, persistence, or pace, these limitations are not significant.  Moreover, neither in the record nor in his testimony did the Plaintiff complain about the lack of concentration, persistence, or pace.[17]

In relying on the testimony of a VE, the ALJ need only include all *relevant* limitations of record from which the claimant suffers.  *See Kasarsky*, 335 F.3d at 543.  Because the Court finds that the mild limitations in concentration, persistence, and pace do not constitute "relevant limitations", the Court concludes that the omission of this element in the ALJ's hypothetical question to the VE does not constitute error.

**D.      ALJ's step four analysis**

Finally, the Plaintiff argues that the ALJ erroneously analyzed his step four and step five findings.  First, the Plaintiff contends that although the VE testified that Plaintiff's past job as a machinist required medium physical exertion, the ALJ found that the Plaintiff was only able to perform light work.

A person is able to perform his past relevant work at step four if he can either perform his actual past relevant work, or perform his past relevant work as it is normally performed in the economy.  *See* 20 C.F.R. § 404.1520(e); *Anderson v. Bowen*, 868 F.2d 921, 925 n.11 (7th Cir. 1989).  The fact that the person cannot perform his particular past work is not determinative.  *Id.*

The VE testified that a machinist's job requires a specific vocational preparation ("SVP") of 7 with medium physical exertion.  *See Dictionary of Occupational Titles* (4th rev. ed. 1991) § 600-280-026.  However, the VE also testified that 12,430 machinist jobs existed in the region, of

---

[17]During testimony, the Plaintiff stated that he has problems with concentrating, but only after the ALJ specifically asked him about concentration.  R. at 276.  The Plaintiff never voluntarily complained, either in the medical records or during the testimony, about his lack of concentration.

which ten percent (10%) only required light physical exertion.[18]   Therefore, the ALJ committed no error in finding that the Plaintiff could perform his past work as a machinist.  However, as stated earlier, because the ALJ posed an improper hypothetical to the VE, a reevaluation of the number of relevant machinist jobs available is required nonetheless.

Plaintiff also argues that based on the consulting physician's opinion that the Plaintiff is limited to "simple work," he cannot perform his past job as a machinist because that requires a SVP of 7.  First, this Court is unable to locate where in the record the consulting physicians state that the Plaintiff is limited to "simple work."[19] Further, the Plaintiff does not provide a definition of "simple work."  Therefore, this Court assumes that the Plaintiff's argument is that a machinist's position exceeds the demands of the Plaintiff's RFC.

SVP is defined as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  *Dictionary of Occupational Titles* (4th rev. ed. 1991), *Appendix C*.  A machinist's job requires a SVP of 7, which is defined as "work requiring over two years and up to four years to learn," and which corresponds to "skilled work" under the Social Security Administration.  SSR 00-4p; *Dictionary of Occupational Titles* (4th rev. ed. 1991), *Appendix C*.

This argument is unavailing.  First, SVP characterizes the difficulty and time it takes to learn a specific type of work.  Thus, SVP has little to do with one's RFC.  Arguably, even individuals who

---

[18]Citing to *Smith v. Barnhart*, 388 F.3d 251, 253 (7th Cir. 2004), Plaintiff also argues that ten percent of machinist jobs available to Plaintiff hardly constitutes work that is "generally performed."  In *Smith*, the Seventh Circuit remanded because the ALJ equated "past relevant work" with sedentary work in general and failed to consider the fact that Plaintiff could not write or type.  *Id.*  In the instant case, the ALJ correctly narrowed the machinist job to those that required only light exertion.  Thus, no error exists here.

[19] Plaintiff's brief quotes the phrase "simple work", *see* Pl.'s Mem. at 24, but does not cite to a particular page in the record.

are found to be "disabled" under the Act can possess a certain SVP if, prior to the disability, the individuals obtained the required "amount of lapsed time" to have learned the specific skills needed for that particular job.   Second, the Plaintiff worked as a machinist from 1997-1999, a span of approximately two years.  Thus, the length of his employment satisfies the requirement for a SVP of 7 and the Plaintiff most likely acquired the skills necessary to work as a machinist, which he can presumably transfer to another machinist job.  Further, the VE testified that, given the hypothetical posed to him by the ALJ and with full knowledge of the SVP requirement in machinist jobs, the Plaintiff could perform approximately 1,200 jobs.  Thus, considering the Plaintiff's past work history, the hypothetical that the ALJ posed to the VE, and the VE's testimony in response to the hypothetical, the ALJ was correct in finding that the Plaintiff could perform his past job as a machinist.  However again, because the ALJ posed an erroneous hypothetical to the VE, on remand, the ALJ may find that no machinist jobs exist in the national economy that the Plaintiff can perform.[20]

Finally, the Plaintiff contends that the ALJ's step five finding was flawed because "as an example" the job of an information clerk requires SVPs of 4, 5, and 6, which equate to semi-skilled and skilled work.  Pl.'s Mem. at 25.  The Plaintiff's argument is unconvincing however because a parking lot attendant (DOT § 915.473-010), an office helper (DOT § 239.567-010), and a shipping and receiving weigher (DOT § 222.387-074) all require only a SVP of 2, which equates to any work requiring a short demonstration and up to and including one month, or, according to the Social Security Administration, unskilled work.  *See* SSR 00-04p.  Thus, assuming *arguendo* that the Plaintiff cannot work as an information clerk because of the required SVP, other jobs *may* exist in

---

[20] *See supra* Section C (discussing the ALJ's erroneous hypothetical).

the national economy.

## CONCLUSION

This Court finds that the ALJ committed harmful error by (1) failing to articulate his reasons for rejecting the opinions of Dr. Fakhouri and Dr. Snead as treating physicians, (2) failing to address all physical limitations found by the consulting physicians Dr. Crawford and Dr. Dobson; and (3) failing to incorporate Plaintiff's inability to perform overhead activities into the hypothetical posed to the VE.  Therefore, to that extent, the Court **GRANTS** the Plaintiff's Motion for Summary Judgment [DE 17] and **REMANDS** this matter under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Order.

SO ORDERED this 22nd day of June, 2007.


s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:      All counsel of record